**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| ANN MARIE HARVEY | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No.: 20-cv-00874-RDB** |
| | ) | |
| | ) | |
| ENOCH PRATT | ) | |
| FREE LIBRARY, ET AL | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, by and through her undersigned counsel, files this Plaintiff's Memorandum In Opposition To Memorandum Of Law In Support Of Defendant's Motion For Summary Judgment (Dkt. No. 18-1) is improper in this case because there are genuine disputes of material facts on each element of Plaintiff's claims.

## I. INTRODUCTION

In this case, Plaintiff filed suit against Defendants, alleging retaliation in violation of Title VII and Section 20. Defendants are not entitled to summary judgment on Plaintiff's claims of disability discrimination and failure to accommodate because material facts are in dispute and Defendant is not entitled to summary judgment as a matter of law.

## II. DISPUTED & UNDISPUTED MATERIAL FACTS

On or about March 10, 1997, Defendant hired Plaintiff as a Young Adult Librarian at its Pennsylvania Avenue branch. At the time Ms. Harvey had a master's degree in library science (M.L.S.) *See* Harvey Deposition, attached hereto as **Exhibit 1** pg. 16. By the year 1999, Ms.

1

Harvey was promoted to a Librarian II position and assistant branch manager at the Pennsylvania Ave branch. Id. In October 2001 Ms. Harvey was promoted to the position of branch manager for the Cherry Hill branch. In 2002 Ms. Harvey became Librarian Supervisor I or branch manager for the Wavery branch. In December 2019 Ms. Harvey was transferred to the Clifton branch as the branch manager. **Exhibit 1** pg. 16

Defendant Enoch Pratt Library is organized into divisions, including its Neighborhood Library Services Division (NLSD) and its Facilities Division ("FD"). All its divisions are under the overall management and command of a chief executive officer ("CEO"). Defendant's Human Resources ("HR") department's policies and procedures are applicable to all its divisions. The NLSD operates the library branches with a chain of command involving a Chief, an assistant chief, group supervisors, and branch managers. *See* NLSD Organizational Chart, attached hereto as **Exhibit 2.** The FD's responsibilities include providing custodians and security staff to library branches. **Exhibit 1** pgs. 21, 96

During the relevant period from 2016 to the present, Ms. Eunice Anderson was Assistant Chief and Chief of NLSD until she announced her retirement in October 2018. After announcing her retirement, Ms. Anderson went on medical leave in October 2018, and retired in December 2018, without returning to work. *See* Anderson Depo pgs. 11-12, attached hereto as **Exhibit 3**. As Chief of NLSD, Ms. Anderson was responsible for the overall day-to-day operations of the library, including staff evaluations, transfers, staffing, and payroll. **Exhibit 3** pgs. 13-15

Between 2017 and 2018 Mr. Herbert Malveaux was the Assistant and or Acting Chief of NLSD. In April 2019 he became the Chief of NLSD. *See* Malveaux Depo, pg. 8, attached hereto as **Exhibit 4.** Between 2015 and 2017 Mr. Malveaux was a Group Supervisor with the Waverly branch within his group. As a Group Supervisor, Mr. Malveaux knew Ms. Harvey as the Branch

Manager for Waverly. **Exhibit 4** pgs. 8-10 As Chief of NLSD, Mr. Malveaux oversees all Defendant's 21 neighborhood library branches in the City of Baltimore and is responsible for the staff at all the branches. **Exhibit 4** pgs.6

In 2018 Ms. Zandra Campbell became a Group Supervisor with the Waverly Branch in her group.  *See* Moran's Depo pg. 16, attached hereto as **Exhibit 5**. A Group Supervisor has several library branches under their supervision. Id. The role of the Group or Regional Supervisor on employee relations issues, is to work with human resources specialist Maria Stokes, after first attempting to resolve issues at the division level. **Exhibit 5** pgs. 22-24

In July 2017 Ms. Robin Moran was hired as Director of Human Resources ("HR"). **Exhibit 5** pg. 16 In August 2017 Defendant hired Ms. Heidi Daniel as Defendant's Enoch Pratt's CEO. **Exhibit 5** pg. 72.  Ms. Moran was interviewed for the position by a panel that included Ms. Campbell. **Exhibit 5** pgs. 19-20. The director of HR duties involved managing an HR team of eight members and providing guidance and input to the CEO and the leadership team. The HR team had one HR generalist that was responsible for benefits and compensation, another for recruitment coordination, one that was responsible for recruitment reclassification, and another for employee relations and conflict resolution involving employees, under the guidance of Ms. Moran. This HR specialist was Maria Stokes. **Exhibit 5** pgs. 6-10. Ms. Stokes also handled disciplinary issues pertaining to employees, including library managers **Exhibit 5** pg. 17

At all times during Plaintiff's employment, Plaintiff performed her job satisfactorily and consistent with the legitimate expectation of Defendants.  Plaintiff has never had an unsatisfactory performance evaluation rating and met expectations on her performance evaluations. **Exhibit 3** pg. 89. Ms. Anderson described Ms. Harvey as committed to public librarianship and a person who desires and demands excellence and has a zeal for her job and demands the same from

subordinates. **Exhibit 3** pg. 118. Mr. Malveaux recalls no complaints one way or the other against Ms. Harvey. **Exhibit 5** pg. 9, lns. 17-21. Ms. Harvey was a good partner with the Waverly branch community, well-liked, and was doing a good job as far as the library goes **Exhibit 5** pg. 74.

### 1.  Ms. Harvey's 2016 EEOC Charge of Gender Discrimination

In the summer of 2016, Ms. Harvey made a complaint of gender discrimination against Defendant.  Ms. Harvey discussed her complaint with Ms. Anderson, who told Ms. Harvey to: "do what's best for her." **Exhibit 3** pgs. 45-46. On August 10, 2016, Plaintiff filed a charge of discrimination against Defendants alleging gender discrimination. Plaintiff's EECO charge of discrimination became the basis of a lawsuit that was filed by the EEOC on behalf of Plaintiff and four other female library branch managers, against Defendants in September 2017. (U.S. Equal Employment Opportunity Commission vs. Enoch Pratt Free Library, et al., Case No. 7-cv-02860-SAG). At all times relevant to the instant case, the EEOC case remained in litigation, until the case was resolve in March 2021 via a judgment against Defendant. (Id.) Ms. Anderson became aware that Ms. Harvey indeed filed an EEOC charge of discrimination alleging gender discrimination. **Exhibit 3** pgs. 45-46. Anderson attended meetings with Library Administration in regard to the gender discrimination case but claims she has no recollection as to what took place at the meetings. **Exhibit 3** pgs. 101-102.

Once Ms. Moran became HR director, she was briefed by her predecessor on the gender discrimination case initiated by Ms. Harvey.  Subsequently, Ms. Moran became actively involved in the case, gathering information, attending depositions, receiving updates on case activities, including court decisions, and holding discussions with CEO Heidi Daniels and others about the case. **Exhibit 5** pgs. 65-67. Ms. Moran was receiving updates on the court's decision in the case. **Exhibit 5** pgs. 68-70.

## 2. Eunice Anderson's Unfinished Business

On or about October 25, 2017, Defendants' then newly hired CEO, Ms. Heidi Daniel, and then Chief of NLSD, Ms. Anderson, held a meeting with branch managers and group supervisors. During the meeting, the managers spoke out expressively about staffing and scheduling issues affecting their branches. Ms. Daniel and Ms. Anderson perceived that the branch managers expressed themselves inappropriately in the presence of the newly hired CEO. After the meeting, Ms. Anderson spoke to Ms. Harvey about the alleged inappropriate behavior of the managers. **Exhibit 1** pgs. 41-48) On or about November 2, 2017, Ms. Anderson issued an email to "Branch Managers" stating in part: "I was surprised and embarrassed by the behavior exhibited; the hostility, mistrust, and unprofessional-ism did not show your good side. Specifically, the presentations on Social Worker In the Library and the announcement of the new hours and the discussion that ensued was completely unacceptable." *See* Anderson 11/02/2017 Email, attached hereto as **Exhibit 6.**

In July 2018, Ms. Anderson issued Plaintiff a disciplinary write-up pertaining to Plaintiff's alleged insubordinate actions at the October 2017 meeting with Ms. Daniel.  Ms. Anderson claim "this was unfinished business because it needed to be documented as part of the disciplinary process. **Exhibit 3** pgs. 80-83. Ms. Anderson contacted and coordinated with Ms. Moran regarding the timing for issuing the disciplinary memo to Ms. Harvey **Exhibit 3** pgs. 94-95, 101. Although the allegations of inappropriate behaviors at the meeting with Ms. Daniel were alleged against all managers present at the meeting, Ms. Harvey was the only one targeted for written disciplinary action. (**Exhibit 3** pgs. 52-60; **Exhibit 1** pgs. 42-48; )

Ms. Anderson alleged that Ms. Harvey's questions regarding staffing and scheduling were put in a harsh and disrespectful tone. **Exhibit 3** pg. 88 Ms. Anderson and Ms. Daniels allegedly

became offended by Plaintiff's tone. **Exhibit 3** pgs. 52, 62. At the meeting all the other managers spoke up like Ms. Harvey, However, Ms. Harvey was the only one who got a disciplinary writeup over the incident. **Exhibit 3** pgs. 52-60; **Exhibit 1** pgs. 42-48; While taking action against Harvey Anderson had it in the back of her mind Harvey's EEOC charge was still pending. **Exhibit 3** pgs. 63-64.

### 3. **Investigation against Ms. Harvey**

On the morning of September 19, 2019, Ms. Harvey sent an email to custodial staff supervisor Lt. Breedlove and Phillip McKoy regarding going over the job expectations at the Waverly branch for Ms. Nicole Nicholson, a new custodian that was assigned to work at Waverly. Ms. Harvey copied Ms. Campbell, on the email. By the night of September 19, 2019, Ms. Harvey emailed her group supervisor Ms. Campbell and NLSD's Chief Mr. Malveaux providing documentation and reporting on Ms. Harvey's interactions with Ms. Nicholson since September 16, 2019, and describing insubordinate and confrontational behavior of Ms. Nicholson towards Ms. Harvey as the Waverly branch manager. *See* Harvey's 9/19/2019 Email attached hereto as **Exhibit 7**. Mr. Malveaux responded that Ms. Nicholson would not be returning to Waverly but did not address the reported insubordinate and confrontational conduct of the custodian. **Exhibit 7**. On September 20, 2019, Ms. Nicholson submitted a handwritten letter addressed "To Whom it May Concern", purportedly to HR, allegedly logging a complaint against Ms. Harvey. *See* Nicholson 09/20/19 Letter, attached hereto as **Exhibit 8**.

### a. *Zandra Campbell's Testimony*:

Around September 17, 2019, Defendant began an "investigation" against Ms. Harvey. The investigation was "triggered by the complaints of Ms. Nicholson because of some type of "negative interaction" with Ms. Harvey. *See* Campbell's Depo. pgs. 71-72, attached hereto as **Exhibit 9**. Ms.

6

Harvey and the custodial staff had a verbal disagreement about work expectations. The custodian staff said Ms. Harvey verbally accosted her at some point in the building. Ms. Harvey said the staff member was saying all sorts of things about her duties as a Branch Manager. Their stories did not match, as each was accusing the other of verbal attack.  **Exhibit 9** pg. 75;  Around that same time, two library staff from the Pennsylvania branch, Ms. Kalyn Shields and Monica Bobbitt who were assigned to the Waverly branch by Ms. Campbell, due to staff shortage there, reported to Ms. Campbell that other Waverly staff members apparently, had concerns about Ms. Harvey. Ms. Campbell directed Ms. Shield and Ms. Bobbitt to tell those Waverly staff members to contact Ms. Campbell. **Exhibit 9** pgs. 76-77. Ms. Bobbitt reported to Ms. Campbell about a customer incident, purportedly involving Ms. Harvey, and Ms. Shields about the staff concerns in general. At this point, Ms. Campbell got Ms. Moran involved and updated Mr. Malveaux. Ms. Campbell and Mr. Malveaux both went to Ms. Moran and told her what they knew and that they needed to do some more discussion with the staff to figure out what exactly is happening. **Exhibit 9** pgs. 77-78 At least a couple of Waverly staff contacted Ms. Campbell. Brittany Allen, who was at Waverly since 2016, and a Christina Boykin, a part-timer who had only been working at Waverly for weeks. **Exhibit 9** pgs. 79-80. This was the first any of these individuals contacted Ms. Campbell about any complaints against Ms. Harvey. Id.

After hearing from Ms. Allen and Ms. Boykin, in September 2019, Ms. Campbell and Ms. Moran held a meeting with Waverly Staff in the absence of Ms. Harvey, and without notice to Ms. Harvey. **Exhibit 9** pg. 80.  At the meeting, the staff raised concerns about the work environment not being positive, people feeling very stressed like they could not relax, they could not smile, and have general conversations. The staff describe a "very strained environment, strained communication, strain interactions" and felt they would suffer retaliation if they came forward.

**Exhibit 9** pgs. 81-82. At the meeting, staff was encouraged to come forward and speak **Exhibit 9** pgs. 80-83. Only Ms. Markham spoke up and expressed mixed feelings, but it later came out that she was not doing the full scope of her job. **Exhibit 9** pg. 83. The others were encouraged to report to HR and share their points of view and concerns. Ms. Campbell also reached out to staff who were no longer working at Waverly as part of her investigation. **Exhibit 9** pg. 84.

After the September 2019 Waverly staff meeting conducted by Ms. Moran and Ms. Campbell, a few people were interviewed at the HR department by Ms. Moran and Ms. Campbell. They included Brittany Allen who gave feedback that it is a stressful work environment with many things to do. **Exhibit 9** pg. 86 A Ms. Ivy complained about having a lot to do with no relief and constant stress. **Exhibit 9** pgs. 87-88. Others were custodian Brian Daniel, custodian Nichole Nicholson, and security officer Ms. Little-Staten **Exhibit 9** pg. 88. Mr. Daniel and Ms. Shields were no longer working at Waverly when interviewed. **Exhibit 9** pg. 89. The first time Ms. Harvey got an opportunity to address the staff allegations was on October 7, 2019. **Exhibit 9** pg. 91.

> **b. Malveaux*'s Testimony:***

Mr. Malveaux had no recollection of any staff or customer complaints against Ms. Harvey during the period between 2015 and 2017, when he was a Group Supervisor of ten branches, including the Waverly branch. Mr. Malveaux got routine complaints from customers or staff from across all the branches in his group, including staff complaints against managers and supervisors. **Exhibit 4** pg. 11. Mr. Malveaux recalls only one staff assigned to the Waverly branch, Mr. Keith Wilson, a custodian, who frequently reported or complained about alleged mistreatment by Ms. Harvey. **Exhibit 4** pgs. 8-10, Mr. Wilson was upset over his schedule and his work tasks. Mr. Malveaux did not substantiate Mr. Wilson's claims against Ms. Harvey and found that Ms. Harvey did not act inappropriately in respect to Mr. Wilson's complaints and did not believe Ms. Harvey needed

any training with respect to how she handled the situations with Mr. Wilson. **Exhibit 4** pgs. 14-17.

Between 2017 and April of 2019, Mr. Malveaux, as assistant Chief of NLSD, received a handful of customer complaints relating to the Waverly branch and Ms. Harvey. These complaints were typical of the complaints by patrons for various reasons, received from most of the library branches. **Exhibit 4** pgs. 18-20; The complaints involving the Waverly branch and Ms. Harvey were not unusual compared to any other branch of the library, and in those instances, Mr. Malveaux did not conclude that Ms. Harvey acted inappropriately. **Exhibit 4** pg. 25 During the said period, except for custodian Keith Wilson's unsubstantiated claims, no other Waverly staff complained against Ms. Harvey. **Exhibit 4** pgs. 26-27.

After April 2019, as Chief of NLSD, Mr. Malveaux began hearing about staff complaints at Waverly from group supervisor Ms. Campbell. Mr. Malveaux was aware that staff at Waverly were generally unhappy and expressing feeling of being overworked. **Exhibit 4** pgs. 28-29. This was general talk, and nothing was substantiated. **Exhibit 4** pg. 30-31. There were staffing and scheduling challenges at Waverly because of retirement and transfer of staff at Waverly, which happened in NLSD from time to time. This compounded problems, and was a source of dissatisfaction for Waverly branch staff.  The reported staff complaints at Waverly did not alarm Mr. Malveaux.  **Exhibit 4** pg. 32-34.

In September 2019, Ms. Moran decided that there needed to be an investigation of Ms. Harvey as a result Ms. Nicholson's complaint against Ms. Harvey.  **Exhibit 4** pg. 37-38) Ms. Moran began the investigation and Mr. Malveaux provided Ms. Campbell to assist Ms. Moran. The investigation of Ms. Harvey was not initiated by Ms. Campbell. **Exhibit 4** pgs. 36-37, 41. Ms. Harvey's September 19, 2019, email to Mr. Malveaux reporting Ms. Nicholson's insubordination,

was not investigated by Mr. Malveaux or HR. **Exhibit 4** pg. 42

   ***c. Moran's Testimony:***

   Ms. Campbell "began conducting an investigation" of Ms. Harvey, "because of some turnover, a lot of staffing events, some kind of ad hoc comments she was receiving from people who used to work at Waverly." **Exhibit 5** pg. 127. As a result, Ms. Campbell became concerned and reached out to Ms. Moran. On September 23, 2019, Ms. Campbell shared with Ms. Moran the investigation and Ms. Moran began her involvement in the investigation to get firsthand information. **Exhibit 5** pg. 128 The investigation was prompted by the level of staff turnover and the level of staff complaints at the branch. **Exhibit 5** pg. 129 Ms. Campbell reported to Ms. Moran that her investigation indicated that people were leaving Waverly in droves because of the management style of Ms. Harvey. **Exhibit 5** pg. 129-130

   As part of the investigation, Ms. Moran interviewed custodial workers Brian Daniels and Keith Wilson. Kalyn Shields, who transferred from Waverly branch to Pennsylvania branch in 2017 was also interviewed at HR. Mr. Wilson had retired since April 2017 **Exhibit 3** pgs. 11-12. Ms. Moran also gathered information from and on, Brittany Allen, an Office Assistant II, who was assigned to work at Waverly since October 2016 and was at the time still assigned at Waverly, Erica Fletcher, an Office Assistant II who resigned in August 2016, and Vanessa Williams, an Office Assistant III who retired in April 2017. Ms. Moran talk to some of them through third party. **Exhibit 5** pg.  135 Harvey was not interviewed by Ms. Moran or Ms. Campbell **Exhibit 5** pg.  141

   Kalyn Shields' interview solicited information between 2015 and 2017 before she transferred to the Pennsylvania branch in December 2017.  **Exhibit 5** pgs. 142-144 Kalyn Shields told Ms. Moran that Ms. Shields left Wavery because Ms. Harvey had a harsh management style and was hard to work with. She shared information about Ms. Harvey requiring staff to work late

hours and staff fearing reprimand from Ms. Harvey. **Exhibit 5** pgs. 147-148; Ms. Shields who had not been a staff at Waverly for two years, was providing information about issues that current and former Waverly staff allegedly had with Ms. Harvey. She shared information about Isabella moved to California sooner than planned to get away from Ms. Harvey. **Exhibit 5** pg. 150 She shared information that Brittany Allen is used to the abuse she received from Ms. Harvey; **Exhibit 5** pgs. 150-151 She shared that Erica Fletcher left because she had enough saved leaves, and Vanessa Williams retired early. **Exhibit 5** pg. 151 She shared that Ms. Harvey is bias against the Asian community.  Kalyn Shields shared information about language that Ms. Harvey used in reference to another staff that was reported to Ms. Harvey's back in 2016; **Exhibit 5** pg. 150-151.

Ms. Moran did not speak directly with Erica Fletcher and instead got information from Brittany Allen that Erica Fletcher had enough of Ms. Harvey and was going to leave did not verify this at Fletcher **Exhibit 5** pgs. 161-162 Keith Wilson also complained that Ms. Harvey used scheduling to retaliate against him after her reported Ms. Harvey for use of foul language. Ms. Harvey told him he could complain to HR but he never did until he was interviewed by Ms. Moran. **Exhibit 5** pgs. 164-166

### 4.  Ms. Harvey's Reporting of Inappropriate Behavior by Custodial and Security Staff:

On or about September 28, 2019, Ms. Harvey observed the security staff at the branch Ms. Little-Staten, talking to a library Page, who was a minor. After inquiring, Plaintiff learned that the minor staff member was discussing an incident where the minor staff member alleged that an elderly male custodian staff member had made inappropriate advances or communications with the minor staff member, including by asking her out. *See* Harvey 9/28/19 Email re Inappropriate Behavior, attached hereto as **Exhibit 10**. **(AH-pgs. 35-39, 50-53)**

On or about September 30, 2019, Plaintiff cautioned Ms. Little-Staten not to interfere in

the investigation of the alleged incident involving the minor staff member, and to allow Plaintiff

to investigate and report the alleged incident appropriately. Apparently, Ms. Little-Staten had

knowledge of the alleged incident weeks earlier and did not report it to the Plaintiff, as required.

However, Ms. Little-Staten ignored Plaintiff's directive and later brought the alleged wrongdoer

to Plaintiff's office and insisted that Plaintiff discuss the alleged incident with Ms. Little-Staten

and the alleged wrongdoer. Plaintiff declined and asked Ms. Little-Staten to leave Plaintiff's office,

to which Ms. Little-Staten refused.  As a result, Plaintiff sent an email to Plaintiff's superiors

reporting and complaining about Officer Little-Staten's actions and requesting immediate

intervention. *See* Harvey 9/28/19 Email re Inappropriate Behavior, attached hereto as **Exhibit 11**.

      **a.** *Lolita Little-Staten testimony*

Ms. Lolita little Staten was assigned to work at Waverly branch in May 2017 as a special police

officer or security officer. Little-Staten Depo. Pgs. 15, 32, attached hereto as **Exhibit 12.**  Ms.

Little-Staten's duties and responsibilities include deescalate situations that may come and protect

the public as well as employees at the branch.  **Exhibit 12** pg. 17.  Ms. Little- Staten is supervised

by herself. **Exhibit 12** pg. 27. Her job duties include reporting to the branch manager **any activities**

**that are going to cause any kind of harm, hurt or danger to come upon anyone. Exhibit 12**

pg.  20 The branch manager gives directives and instructions to Ms. Little-Staten if she is doing

something wrong. **Exhibit 12** pg.  27 Ms. Little-Staten's duties include reporting issues to the

branch manager. **Exhibit 12** pg. 31

      After Ms. Harvey sent the September 28, 2019, email about inappropriate behavior

involving Ms. Little-Staten, Ms. Maria Stokes met with Ms. Little-Staten about the - about the

report of sexual harassment involving a custodian.  **Exhibit 12** pg. 16, lines 16-21 At the meeting

Ms. Stokes gave Ms. Little-Staten a copy of Defendant's policy on sexual harassment and asked

her to write an incident report regarding the occurrence. Ms. Little-Staten was not familiar with Defendant's sexual harassment policies and procedures **Exhibit 12** pg. 31 Ms. Stokes did not discuss the allegations in Ms. Harvey's September 28, 2019 email with Ms. Little-Staten.   **Exhibit 12** pg.  22, line 13.

Ms. Little-Staten initially claim that Mr. Anthony asked Ms. Little-Staten to be his witness as Ms. Harvey wanted to have a meeting with him. **Exhibit 12** pg.  16, lns. 16-21 - Ms. Little-Staten believed the minor staff and "ladies" who alleged sexual harassment against Mr. Anthony did not want him around because of his funny looking eyes and wanted to get rid of him.  **Exhibit 12** pg.  20, ln. 17

When presented with documents pertaining to the incident, Ms. Lolita recanted her testimony About Mr. Anthony asking her to be a witness in a meeting with Ms. Harvey. **Exhibit 12** pg. Page 26- The custodian did not asked Ms. Little-Staten to be a witness in any meeting with Ms. Harvey. Ms. Lolita was the one who asked the custodian to go have a meeting with Ms. Harvey about the sexual harassment allegations, so she could find out what Ms. Harvey knew.  **Exhibit 12** pg. 9-12, 27, lns. 3-10- Ms. Harvey had asked Ms. Little-Staten not to interfere with Ms. Harvey's duties as a manager.  However, Ms. Little-Staten claim she did not have any idea what that meant, and instead sought to direct the handling of the sexual harassment allegation against the custodian. She then alleged that the custodian requested her to accompany him as a witness. Upon reaching Ms. Harvey's office, Ms. Little-Staten was asked to leave, and she refused, alleging that the custodian did not trust Ms. Harvey. **Exhibit 12** pg. 29, lns. 2-15. Ms. Little-Staten said she relied on the authority of the custodian in refusing to leave Ms. Harvey's office as requested. **Exhibit 12** pgs. 41-42, lines 22-3

**5.  Post Investigation Action Against Ms. Harvey**

### a.   *Moran's Testimony:*

On or about October 7, 2019 Ms. Moran, Mr. Malveaux and Ms. Campbell met with Ms. Harvey to present her with the findings of the investigation. **Exhibit 5** pg. 168 to 170.  Ms. Harvey was told not to return to Waverly on October 7, 2019, but no decision was yet made about Harvey not returning as branch manger. **Exhibit 5** pg. 169.  That decision was made after the October 7th meeting which concluded the investigation. The finding of the investigation was shared with Ms. Harvey on October 7, 2019 in a meeting that lasted for two hours. **Exhibit 5** pg.  170.

Mr Malveaux opened the meeting by talking about the incident with the custodian, followed by Ms. Campbell who focused on the behaviors reported by Waverly staff. **Exhibit 5** pg. 173 to 174 Ms. Harvey was never told which staff made which allegations because staff were allegedly fearful of Ms. Harvey. **Exhibit 5** pg.178 During the meeting Ms. Harvey "looked to the sky and "shut down". She did not respond to the allegations. She appeared to be upset she teared up but she wouldn't talk. **Exhibit 5** pgs.  180-182

On or about November 25, 2019, Ms. Moran, Mr. Malveaux and Ms. Campbell  again met with Ms. Harvey and presenting her with a letter of expectation and a Performance Improvement Plan ("PIP"). **Exhibit 5** pg.  183 to 184. At this meeting a decision was already made to remove Ms. Harvey from the Waverly Branch, but Ms. Moran never told Ms. Harvey to resign.  **Exhibit 5** pg. 185 Ms. Campbell and Mr. Malveaux made the decision to transfer Ms. Harvey to the Clifton branch because the staff are older in contract with the staff at Waverly and less likely to be affected by the alleged intimidating behaviors that Ms. Harvey presented at Waverly **Exhibit 5** pg.  187 Clifton as a branch where a strong branch manager with good community skills is needed is where Ms. Harvey would make the best impact. **Exhibit 5** pgs.  187-188. She had good outreach skills, is strong manager and has good librarian skills. However, she struggles with her ability to manage

and engage which can be corrected through appropriate training. **Exhibit 5** pgs. 188-189

Defendant has no policy that prevents a staff from visiting a library branch without an escort or prior notice to a supervisor. However, Ms. Harvey was barred from returning to Waverly without an escort or prior notice, because she allegedly created an "hostile work environment" and staff at Waverly were fearful of Ms. Harvey. They were very fearful of her coming back on site without them knowing what was going on and not knowing how she was going to react. **Exhibit 5** pg. 189-190. She was never banned from Waverly forever however this was never communicated to Ms. Harvey **Exhibit 5** pgs. 192-194 After Ms. Harvey was transferred Nicole Nicholson was returned back to Waverly as a custodian because the staff liked her. **Exhibit 5** pg. 194-195; Shortly thereafter, Ms. Nicholson was terminated from her employment with Defendant for irregular attendance and work performance issues.

### b. *Malveaux Testimony:*

In late September or early October 2019, Mr. Malveaux participated in meeting with Ms. Moran and Ms. Campbell where a conclusion was reached that Ms. Harvey needed to be removed from Waverly branch. **Exhibit 4** pg. 59. Ms. Moran made or recommended the decision to remove Ms. Harvey. The decision to remove Harvey was based on the information gathered by Robin Moran's investigation which led to the conclusion that there was a hostile work environment at Waverly, Ms. Harvey was the case and something had to be done. **Exhibit 4** pgs. 60-61. At the October 7, 2019 meeting with Ms. Harvey, a decision was already made to remove Ms. Harvey from the Waverly branch. **Exhibit 4** pgs. 60-64 During the discussion to remove Ms. Harvey a decision was made to refer Ms. Harvey to Defendant's EAP office. **Exhibit 4** pg. 69

At the November 25th 2019 meeting with Ms. Harvey, Ms. Moran, and Ms. Campbell, Ms. Harvey was issued with a work performance improvement plan and told she would not be returned

to the Waverly branch. **Exhibit 4** pgs. 71-72 Mr. Malveaux signed off on Ms. Harvey's transfer relying on Ms. Moran's verbal report of her investigation; although he did not see or review a written report. He relied on the conclusion of Ms. Moran and signed off on the transfer of Mr. Harvey to the Clifton branch. Ms. Harvey was never given an official transfer letter; the transfer was communicated to her verbally. **Exhibit 4** pgs. 81-85

   ***c. Zandra Campbell's Testimony:***

   The investigation against Ms. Harvey concluded on October 2, 2019.  On October 3, 2019, Ms. Campbell and Ms. Moran met and agreed to schedule a meeting with Ms. Harvey for October 7, 2019. **Exhibit 9** pgs.153; The two had met with staff from September 23 until October 2, 2019. Id.  At the October 7, 2019 meeting, Ms. Harvey was confronted for the first time with the staff allegations. She was told it was an environment that was negatively impacting the staff that management needed to reassess what was happening at Waverly and take the staff concerns seriously. **Exhibit 9** pgs.157-168

   Prior to the October 7, 2019 meeting, Ms. Harvey had asked HR for a meeting addressing Ms. Nicholson's behavior. **Exhibit 9** pg. 154. At the October 7, 2019 meeting, Ms. Harvey was expecting to talk about one thing and felt like she was ambushed with allegations from Ms. Moran and Ms. Campbell.  The meeting Ms. Harvey requested was never granted. **Exhibit 9** pgs.165-166

   Prior to the October 7, 2019 meeting with Ms. Harvey, a decision was made to refer Ms. Harvey to Defendant's Employee Assistance Program (EAP). At the end of the meeting Ms. Harvey left work although no one told her not to return to work that day.  **Exhibit 9** pgs. 169. Harvey was asked to take time and talk to EPA and get something set up for herself and to concentrate on herself. It was Campbell's understanding that Harvey would remain as manager of Waverly branch. Id.

### *d.* **Ms. Harvey Version**

On October 3, 2019 Ms. Harvey received an email scheduling a meeting with Ms. Moran, Mr. Malveaux and Ms. Campbell for October 7, 2019 to "discuss the recent concerns at Waverly". *See* Campbell's 10/03/19 Email, attached hereto as **Exhibit 13**.

On or about October 7, 2019, Plaintiff met with Ms. Moran, Mr. Malveaux, and Ms. Campbell.  The meeting was requested by Plaintiff arising from the Plaintiff's September 19th 2019 reporting of the insubordinate action of the custodial worker, the matter of Ms. Little-Staten's inappropriate intervention in the incident involving the minor staff member, and several staffing issues at Waverly branch.  The October 7, 2019, meeting, however, did not address the matters that Plaintiff had requested the meeting to address.  Instead, at the meeting, Ms. Moran berated Plaintiff's management style and alleged that Plaintiff was a "bully" and a "tyrant." Ms. Moran also alleged various reports of complaints by Plaintiff's subordinates against Plaintiff. Prior to this meeting, Plaintiff was never notified or counseled about any reports or complaints against Plaintiff by Plaintiff's subordinates. *See* Harvey's 10/16/19 Email, attached hereto as **Exhibit 14**

At the end of the meeting, Plaintiff was humiliated and embarrassed. Plaintiff's integrity, character, and work ethics were attacked by her superiors throughout the meeting. At the end of the meeting Ms. Moran told Plaintiff that Plaintiff must not return to Waverly and instead should take "some time" to "figure out" what Plaintiff wanted to do. As a result, Plaintiff immediately sought the intervention of Defendants' Employee Assistance Program (EAP) to cope with the situation. Plaintiff also took FMLA leave to seek medical attention after Plaintiff became physically and emotionally shocked, and became distraught by what occurred at the October 7, 2019 meeting.  Id.

On or about November 25, 2019, Ms. Harvey returned to work, having taken from FMLA

leave from October 8, 2019, to November 8, 2019, and vacation leave from November 11, 2019 to November 22, 2019. Upon returning to work, Ms. Moran, Mr. Malveaux and Ms. Campbell again met with Ms. Harvey where Ms. Moran told and requested Ms. Harvey to resign.  After Ms. Harvey decline to do so, Ms. Moran talked about seeing if there were any positions for Ms. Harvey that does not involve managing staff.  Ms. Harvey was directed to take that day, and the following day off, and Ms. Harvey would hear from Ms. Moran on Wednesday November 27, 2019. *See* Harvey' 11/25/19 Email, attached hereto as **Exhibit 15**.  Plaintiff was told to use her own vacation leave from work, while Ms. Moran decided what to do with Ms. Harvey. Id.

When Plaintiff returned to work on December 3, 2019, Plaintiff was immediately placed on a Performance Improvement Plan (PIP) and immediately transferred to Defendants' Lake Clifton ("Clifton") branch, a smaller branch than Waverly, where Plaintiff will be less likely to further develop, acquired, and apply Plaintiff's librarian skills and expertise. The transfer also limits, if not bars, Plaintiff from opportunities for promotion with Defendant. Plaintiff was give an letter of expectation limited role as a manager at Clifton had to go through superiors before delaing with subordinate staff. *See* Letter of Expatation, attached hereto as **Exhibit 16. Exhibit 1** pg. 61

On December 16, 2019, Ms. Harvey received an email banning her from freely visiting Waverly branch without an escort or advance notice to a supervisor. *See* Campbell's 12/16/19 Email, attached hereto as **Exhibit 17**. **Exhibit 1** pgs. 65-66

### III. STANDARD OF REVIEW

"If the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law," then summary judgment may be rendered. Fed R. Civ. P. 56(c). In other words, summary judgment is only to be granted when no

genuine and disputed issues of material fact remain and the movant is clearly entitled to prevail as a matter of law. Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). However, "[if] the moving party has met its responsibility of identifying the basis for its motion, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.' " <u>White v. Rockingham Radiologists</u>, Ltd., 820 F.2d 98, 101 (4th Cir. 1987) (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986); Fed. R. Civ. P. 56(e)).

A genuine issue of material fact may exist if the evidence presented to the court is sufficient to indicate the existence of a factual dispute that could be resolved in favor of the non-moving party at trial. <u>Rachael-Smith v. FTDATA</u>, Inc., 247 F. Supp. 2d 734, 742 ( <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986)) Only "facts that might affect the outcome of the suit under the governing law" are material. <u>Anderson</u>, 477 U.S. at 248. Moreover, a dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

In considering a motion for summary judgment, a court does not weigh evidence of a genuine issue of material fact that a party adduces against the movant's evidence, but submits it to the trier of fact for resolution. <u>Anderson v. Liberty Lobby, Inc</u>., 477 U.S. 242 (1986). In that context, a court must consider the facts and evidence of the non-moving party as true. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)</u>. In addition, all reasonable inferences drawn from disputed evidence are to be resolved in the light most favorable to the nonmoving party. <u>Pulliam Investment Co., Inc. v. Cameo Properties</u>, 810 F.2d 1282, 1286 (4th Cir. 1987). The party seeking summary judgment bears the responsibility of demonstrating the "absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, All U.S. 317, 323 (1986)."

19

# IV. ARGUMENT

## 1. Defendants are Not Entitled Summary Judgment

Defendants are not entitled to summary judgment in this case, because there are genuine issues of dispute regarding material facts in the case, and furthermore, Defendants are not entitled to judgment as a matter of law.

### a. Genuine Issues of Dispute Regarding Material Facts:

There are genuine issues of dispute pertaining to material facts in this case. "A genuine issue of material fact may exist if the evidence presented to the court is sufficient to indicate the existence of a factual dispute that could be resolved in favor of the non-moving party at trial. Rachael-Smith v. FTDATA, Inc., 247 F. Supp. 2d 734, 742 ( Anderson v. Liberty Lobby, Inc.,477 U.S. 242 (1986)) Only "facts that might affect the outcome of the suit under the governing law" are material. Anderson, 477 U.S. at 248. Moreover, a dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

Although the parties don't disagree that an alleged investigation was conducted against Ms. Harvey, the disciplinary nature and outcome of the alleged investigation is clearly of material dispute in the case, particularly if the investigation qualifies legally as an adverse action. Defendant's claim that the investigation was not disciplinary in nature and did not lead to any disciplinary outcome.  However, Plaintiff contend that the investigation was disciplinary in nature and outcome. It was designed and conducted with the intent to terminate Plaintiff's employment, but ultimately resulted in a transfer of Plaintiff with diminished authorities at the new branch. **Exhibit 4** pg. 81-85  Again, although the parties agree that the investigation targeting Plaintiff resulted in Plaintiff been referred to Defendant's EAP and for FLMA to take time off and focus

on herself, the parties genuinely dispute those facts that this resulted in an adverse change to the terms, benefits and conditions of Ms. Harvey's employment with Defendant. At a minimum, when Ms. Harvey returned to work on November 25, 2021, she was told to stay away for work for the next two days, until Ms. Moran decided about what to do with Ms. Harvey, after Ms. Harvey refused to resign.  For those two days, Ms. Harvey lost income and or had to use her vacation time for those two days. **Exhibit 16. Exhibit 1 pgs. 58-61** Additionally, the parties agreed that Plaintiff was transferred, but genuinely dispute the adverse nature and effect of the transfer on Plaintiff's employment as a librarian. Defendant, claim that there were substantive changes, in Plaintiff job positions, duties and functions as branch manger at Clifton branch.  However, the clear instruction for the letter of intent, diminished Plaintiff status, buy taking away Plaintiff's direct supervisory responsibility over subordinate staff, without prior approval from Ms. Harvey's superiors. **Exhibit 16**, **Exhibit 1** pg. 61

**b.  Defendants are Not Entitled To Judgment as A Matter of Law:**

"Title VII prohibits employers from discriminating against employees for "oppos[ing] any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C.A. § 2000e-3." *Johnson v. United Parcel Serv.*, CIVIL No. JKB-19-1916, at *11 (D. Md. Jan. 15, 2020) The facts in record in the case, shows that Ms. Harvey can legally prove her claim of retaliation and meet her ultimate burden of persuasion and production in this case. To establish a prima facie case of retaliation under Title VII and Section 1981, the plaintiff must show: (1) she engaged in a protected activity; (2) the employer acted adversely against her; and (3) there was a causal connection between the protected activity and the adverse employment action. *Guessous v. Fairview Prop. Investments*, LLC, 828 F.3d 208, 216–17 (4th Cir.

21

2016). "An employee may satisfy the first element by showing that she opposed a practice that Title VII prohibits." *Jenkins v. Gaylord Entm't Co.*, 840 F. Supp. 2d 873, 880 (D. Md. 2012). "For such activity to constitute opposition, the plaintiff must have a reasonable and good faith belief that the conduct [] she opposes constitutes unlawful discrimination under Title VII." Id. at 881 (citing *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001)). "Opposition almost always arises when an employee communicates to her employer her reasonable belief that the employer has engaged in discrimination." Id. (citing *Crawford v. Metro. Gov't of Nash. and Davidson Cty., Tenn.,* 555 U.S. 271, 276 (2009)). "[T]the Fourth Circuit has held that the filing of an EEOC complaint generally constitutes protected activity." *Kearns v. Northrop Grumman Sys. Corp.*, Civil No. ELH-11-1736, 2014 WL 2170781, at *10 (D. Md. May 23, 2014). As to the second element, "[a] plaintiff can demonstrate that an employer 'acted adversely' by showing that 'a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Lewis v. Baltimore City Bd. of Sch. Commissioners*, 187 F. Supp. 3d 588, 595 (D. Md. 2016) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). An adverse action in a retaliation claim must be "materially adverse." *Burlington N.*, 548 U.S. at 68.If a plaintiff carries this burden, the burden shifts to the employer to offer a legitimate, non-discriminatory reason for the action. Once such a reason is proffered, the plaintiff carries the ultimate burden of proving "both that the reason was false, and that [retaliation] was the real reason for the challenged conduct." *Beall,*130 F.3d at 619, quoting *Jiminez v. Mary Washington College,*57 F.3d 369, 377-78 (4th Cir. 1995); *Dowe v. Total Action Against Poverty in Roanoke Valley,*145 F.3d 653, 656-58 (4th Cir. 1998); *Laughlin v. Metropolitan Washington Airports Auth.,*149 F.3d 253, 258 (4th Cir. 1998). *Settle v. Baltimore County*, 34 F. Supp. 2d 969, 993 (D.

Md. 1999)

### i.   Ms. Harvey Engaged in a protected activity

Ms. Harvey engaged in protected activities in filing her EEOC Charge of Discrimination and participating in the subsequent EEOC lawsuit based on your EEOC Charge of Discrimination, and further by opposing and reporting Ms. Little-Staten's interference into Ms. Harvey's probe of a sexual harassment allegation by Ms. Harvey's staff against a custodian. **Exhibit 12** pg.  29, ln. 2-15. There are two distinct types of retaliation claims under Title VII: those brought under the "participation clause" and those brought under the "opposition clause." Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 259 (4th Cir. 1998). The "participation clause" provides that an employer may not retaliate against an employee "because [the employee] has ... participated in any manner in an investigation, proceeding, or hearing under" Title VII. 42 U.S.C.A. § 2000e-3(a) "The participation clause is designed to ensure that Title VII protections are not undermined by retaliation against employees who use the Title VII process to protect their rights." Brower v. Runyon, 178 F.3d 1002, 1006 (8th Cir. 1999). The "opposition clause," on the other hand, provides that an employer may not retaliate against an employee "because he has opposed any practice made an unlawful employment practice" by Title VII. 42 U.S.C.A. § 2000e-3(a). As the Fourth Circuit has observed, [t]he distinction between participation clause protection and opposition clause protection is significant because the scope of protection is different. Activities under the participation clause are essential to the machinery set up by Title VII. As such, the scope of protection for activity falling under the participation clause is broader than for activity falling under the opposition clause. Laughlin, 149 F.3d at 259 n. 4 (citations, quotations omitted).

*Mezu v. Morgan State Univ.*, Civil Action No. WMN-09-2855, at *24-25 (D. Md. July 29, 2013)

Here Ms. Harvey satisfies both the participation and the opposition clause of Title VII protection for protect activities against retaliation.   Ms. Harvey's 2016 EEOC Complaint of gender discrimination against Defendant and the subsequent filing of a EEOC charge and participation in the EEOC lawsuit based on the said EEOC Charge, certainly demonstrates clear protected participation activites and opposition activities where Plaintiff's actions "a reasonable and good faith belief that the conduct [] she opposes constitutes unlawful discrimination under Title VII." "For such activity to constitute opposition, the plaintiff must have a reasonable and good faith belief that the conduct [] she opposes constitutes unlawful discrimination under Title VII." Id. at 881 (citing *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001)). "Opposition almost always arises when an employee communicates to her employer her reasonable belief that the employer has engaged in discrimination." Id. Furthermore, Ms. Harvey engaged in protected activity when she opposed and reported the interference of Ms. Little Staten in her responsibility as the branch manager to handle a sensitive allegation of unwanted sexual advance and communication against a custodial staff by a library Page, who was a minor. **Exhibit 10.** Defendants failed to investigate Ms. Harvey's complaint against the Ms. Little Staten, and instead used information from Ms. Little-Staten to conclude that Plaintiff created a hostile work environment at Waverly. **Exhibit 1** pgs. 50-53, Ms. Little-Staten suffered no consequences for her insubordinate actions in refusing to leave Ms. Harvey's office when asked to do so and bring the alleged wrongdoer to Ms. Harvey's office to confront Ms. Harvey. **Exhibit 11.**

### ii.  Defendants Acted Adversely Against Ms. Harvey

Defendants took adverse action against Ms. Harvey in targeting Ms. Harvey for a sham investigation, issuing Ms. Harvey a reprimand, forcing Ms. Harvey to take FLMA, transferring

Ms. Harvey with diminished authority, and banning Ms. Harvey from freely accessing the Waverly library branch. **Exhibit 5** pgs. 192-194**.**   Furthermore, Ms. Harvey can demonstrate that Defendants 'acted adversely' by showing that 'a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" An adverse employment action for purposes of a discrimination claim is an action that "adversely affects the terms, conditions, or benefits of the plaintiff's employment." *McNeil v. Loyola Univ.,* No. WDQ-13-1473, 2014 WL 320494, at *6 (D. Md. Jan. 27, 2014); *see Burlington N. & Santa Fe Ry. v. White,* 548 U.S. 53, 64 (2006). "The 'typical requirements for a showing of an "adverse employment action"' are allegations of 'discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion.'" *McNeil,* 2014 WL 320494, at *6 (quoting *Boone v. Goldin,* 178 F.3d 253, 255 (4th Cir. 1999), *abrogated on other grounds by Burlington N.,* 548 U.S. at 67). *Muldrow v. Blank*, Case No.: PWG-13-1200, at *13 (D. Md. Mar. 10, 2014) "While an adverse employment action need not be an "ultimate employment decision" such as termination, the action taken must adversely affect "the terms, conditions, or benefits of employment." Von Guten v. Maryland, 243 F.3d 858, 866 (4th Cir. 2001). " *Hoffman v. Baltimore Police Dept*, 379 F. Supp. 2d 778, 792 (D. Md. 2005)

### iii.  Issuing Ms. Harvey, A Consequential Disciplinary Reprimand

The October 2018 reprimand and disciplinary memo issued to Ms. Harvey, negatively impacted Ms. Harvey's performance evaluation in and began a progressive disciplinary process intended to lead to Ms. Harvey's termination, but ultimately resulted in Ms. Harvey's transfer. **Exhibit 1** pgs. 42-46 A reprimand, whether oral or written, does not per se significantly affect the

terms or conditions of employment. *Lewis v. Forest Pharms., Inc.*, 217 F. Supp.2d 638, 648 (D.Md. 2002). However, "if evidence shows that a reprimand not only bruises an employee's ego or reputation, but also works a real, rather than speculative, employment injury, the reprimand becomes [an adverse ] employment action ." *Jeffers v. Thompson*, 264 F. Supp. 2d 314, 330 (D. Md. 2003) In the instant case, the reprimand becomes an adverse action, when it lead to a poor performance rating and becomes a necessary first step before termination of employment in a progressive disciplinary process.

### iv.  Baseless and Sham Disciplinary investigation Against Ms. Harvey

Having begun laying the groundwork for terminating Ms. Harvey's employments, starting with issuing the July 2018 disciplinary memo only against Ms. Harvey for conduct alleged against all branch managers, in September 2019 Ms. Moran initiate a sham disciplinary investigation targeting Ms. Harvey. **Exhibit 3** pgs. 94-95, 101.  "If a disciplinary investigation is reasonably rooted in articulable facts justifying such an investigation, neither inconvenience nor emotional anxiety on the employee's part will constitute an "employment injury" sufficient to render  the investigation itself  an adverse employment action independently  cognizable  under Title VII." *Settle v. Baltimore County*, 34 F. Supp. 2d 969, 992 (D. Md. 1999)

Here the investigation was not reasonably rooted in articulable facts justifying such an investigation. The investigation began after Ms. Harvey send a detail complaint of insubordination against a custodian. **Exhibit 3** pgs. 80-83. However, Ms. Harvey's complaints against the custodian were never investigated. **Exhibit 4** pg. 42. Instead, after Ms. Harvey's detail complaint and request for a meeting with her supervisors and the custodian's supervisor  Ms. Moran began to investigate Ms. Harvey, based on subsequent allegations by the custodian.  The investigation was conducted without the knowledge or participation of Ms. Harvey.   The

investigation reached conclusions on which the decision to transfer Ms. Harvey was made, without getting Ms. Harvey's version of event. **Exhibit 9** pg. 91. These issues alone, eviscerates any basis on which Defendants can claim the investigation to be rooted on justified articulable facts.

Furthermore, the staff at Waverly were experiencing a stressful working conditions because of a chronic and at time, acute staffing shortage at the Waverly branch.  All the staff complaints that were rumored about at the Waverly branch were typical of complaints received from other branches, and Chief of NLSD Mr. Malveaux was never alarmed or concern about those incidents.

### v.   Forcing & Triggering Ms. Harvey to take FLMA Leave

For the October 7, 2019, meeting, Ms. Moran had made the decision that Ms. Harvey would not be returned to the Waverly Branch, and further that she would be referred to the EAP to take some time off and focus on herself. **Exhibit 5** pgs. 169 -170. The effect of the sudden and unexpected allegations and accusations against Ms. Harvey also resulted in Ms. Harvey feeling the need for EAP and FLMA leave to address the emotional trauma she experienced for Defendant's actions. Ms. Harvey took FLMA leave from October 8, 2019, to November 8, 2019, and vacation leave from November 11, 2019 to November 22, 2019.  Upon return to work on November 25, 2019 at the request of Defendants, Ms. Moran forced Ms. Harvey back on leave for two days to allow Ms. Moran to decide what to do with Ms. Harvey. Defendant did not pay Plaintiff for the two days and plaintiff loss income and or vacation pay for those two days. **Exhibit 15** Although it is not clear in this circuit "whether placement on administrative leave constitutes an adverse employment action. *Compare Von Gunten v. Maryland*, 243 F.3d 858, 869 (4th Cir. 2001) (placing employee on administrative leave during investigation of complaint

lodged against employee is not an adverse employment action) *Bonds v. Leavitt*, 647 F. Supp. 2d 541, 556 (D. Md. 2009) In this case, however, Plaintiff was forced on leave almost two months after the alleged investigation was conducted targeting Plaintiff     and  more  a  month  after Plaintiff went out on FLMA and vacation leave, arising from the investigation of Plaintiff

### vi.  Transferring & Reducing Ms. Harvey's Authority as a Branch Manager

Ms. Harvey's transfer to the Clifton branch resulted in reduced supervisory duties and diminished responsibilities.  See *Czekalski v. Peters*, 475 F.3d 360, 364 (D.C.Cir.2007) (noting that a lateral transfer can constitute an adverse employment action if it results in the withdrawal of  an  employee's  "supervisory  duties"  or  "reassignment  with  significantly  different responsibilities" (internal quotations and citations omitted)); *Fordyce v. Prince George's Cnty. Md.*, 43 F. Supp. 3d 537, 548 (D. Md. 2014) "As noted, a decrease in opportunity for promotion constitutes an adverse employment action." Boone, 178 F.3d at 256-57. *Musema v. Balt. City Police Dep't*, Civil Action No. ADC-18-0158, at *18 (D. Md. Feb. 5, 2019)

Although Ms Harvey retained her tile as branch manager, her supervisory authority over subordinate staff was curtailed with directives that Ms. Harvey must report her "employee relations issues with your leadership before you address with the employee. **Exhibit 16, Exhibit 1** pg. 61

> She provided evidence showing that her transfer resulted in withdrawal of her supervisory duties for at least a period of time, and a change in the nature and amount of work she was given. (Id.). Plaintiff has provided sufficient evidence to create a material dispute of fact with regard to whether her transfer to the TRU was an adverse employment action.

*Fordyce v. Prince George's Cnty. Md.*, 43 F. Supp. 3d 537, 549 (D. Md. 2014)

### vii. Banning Ms. Harvey From Freely Accessing The Waverly Branch.

Defendant's banning of Ms. Harvey from freely accessing the Waverly branch adversely affected Ms. Harvey's employment conditions and benefits.

> *ee e.g., Manning v. Metropolitan Life Ins. Co.,* 127 F.3d 686, 692 (8th Cir. 1997) (ultimate employment decision includes "tangible change in duties or working conditions that constituted a material employment disadvantage"); *Kim v. Nash Finch Co.,* 123 F.3d 1046, 1060 (8th Cir. 1997) (ultimate employment decision includes reduction of duties, actions that disadvantage or interfere with the employee's ability to do his or her job, "papering" of an employee's file with negative reports and reprimands even though employee was "not discharged, demoted, or suspended").

*Von Gunten v. Maryland*, 243 F.3d 858, 864 (4th Cir. 2001)

Plaintff was permanently barred from employment benefit associated with attending the libaray brach for which she was the branch manager for 18 years. **Exhibit 17. Exhibit 1** pgs. 58-61. This goes beyond a mean discomfort and to the benefit of employment, event as to Plaintiff's freedom and right to free movement.

**2. Causal connection Exist between Ms. Harvey's protected activity and Defendants' adverse employment actions Against Ms. Harvey**

Causal connection exists between Ms. Harvey's protected opposition and participation activities and the adverse employment action by Defendant against Ms. Harvey. *See Waag v. Sotera Def. Sols., Inc.*, 857 F.3d 179, 192 (4th Cir. 2017) (recognizing that "for purposes of establishing a prima facie case, close temporal proximity between activity protected by the statute and an adverse employment action may suffice to demonstrate causation"); "*See, e.g., McNairn v. Sullivan,* 929 F.2d 974, 980 (4th Cir. 1991) (plaintiff stated prima facie case even though there was no evidence of causal connection other than the fact that plaintiff was fired after bringing a lawsuit)." *Karpel v. Inova Health System Services*, 134 F.3d 1222, 1229 (4th Cir. 1998)

As to Ms. Harvey's protected activity of protesting and reporting Ms. Little-Staten's interference in Ms. Harvey's handling of a complaint of unwanted inappropriate advances by a custodial staff, Defendants' adverse transfer came within a couple weeks thereafter. Furthermore, except where the adverse action occurred at "'the natural decision point.'" weak evidence of temporal proximity, plus evidence of a disproportionate response, is enough to show causation.

*See Wilcox v. Lyons*, 970 F.3d 452, 457 (4th Cir. 2020) Here Defendants used the end of the sham investigation as the natural decision point to take adverse action against Ms. Harvey.

### 3. Plaintiff Can Establish Pretext

Defendant's articulated reasons for Plaintiff Targeting Ms. Harvey for a sham investigation, issuing Ms. Harvey reprimand, forcing Ms. Harvey to take FLMA, transferring Ms. Harvey, banning for freely accessing the Waverly library branch, are inconsistent, false, and unbelievable. "In order to show pretext, a plaintiff may show that an employer's proffered nondiscriminatory reasons for the termination are inconsistent over time, false, or based on mistakes of fact. *E.E.O.C. v. Sears, Roebuck & Co.*, 243 F.3d 846, 852–53 (4th Cir. 2001)."

Defendant issuing of the disciplinary reprimand and memo to Ms. Harvey, almost one year after the alleged occurrence, but only against Ms. Harvey, although all branch managers were alleged to have misbehaved during the 2017 meeting with Ms. Daniel shows that the reason is false. If not, why weren't the other managers given reprimand and a disciplinary memo. **Exhibit 3** pgs. 94-95

The investigation conducted against Ms. Harvey was baseless and a complete sham. Although Ms. Harvey provided a detail report on the insubordinate and confrontational behavior or a subordinate custodian employee, Ms. Harvey's complaint was totally ignored and a subsequent complaint by the said custodian was used as the basis to initiate an investigation against Ms. Harvey of which she was never notified or in which her participation was never sought. The investigation largely focused on several custodial or clerical staff at assigned to Waverly branch, who had long ceased working at Waverly branch.  Most of the information provide was hearsay information from Ms. Shield, who herself had transferred from Waverly in December 2017. Furthermore, Mr. Malveaux made clear that the alleged complaints against Ms. Harvey were like

those received at many other branches and not uncommon. Mr. Malveaux made clear that none of the staff or customer complaint involving Ms. Harvey were of serios concern or cause him alarm.

## V. CONCLUSION

WHEREFORE, of the foregoing reasons, Defendant is not entitled to summary judgment and Plaintiff is entitled to have the trier of facts make a determination in her case.

Respectfully Submitted,

*/s/ George A. Rose*
George A. Rose, Esq.
Federal Bar No.: 26086
Rose Law Firm, LLC
9134 Liberty Road
Baltimore, Maryland 21133
Phone: 410.727.7555
Fax: 443.320.0962
Email: grose@roselawfirm.net
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 21st day of July 2021, a copy of the foregoing Plaintiff's Memorandum In Opposition To Memorandum Of Law In Support Of Defendant's Motion For Summary Judgment, was electrically filed in accordance with the Electronic Filing Requirements and Procedures as established by the U.S. District Court for the District of Maryland.

Respectfully,

*/s/ George A. Rose*
George A. Rose, Esq.
Federal Bar No.: 26086

31